**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION**

**JOHN KILMARTIN,**
    **Plaintiff,**

v.                                                                                              Case No.  2:08-CV-661-FtM-DNF

**MICHAEL ASTRUE,
Commissioner of Social Security,**
    **Defendant.**
_____/

## OPINION AND ORDER[1]

The Commissioner originally found Plaintiff disabled and entitled to disability insurance benefits as of June 13, 1994. Pursuant to periodic review, the Commissioner found Plaintiff was no longer disabled as of February 1, 2001. On May 27, 2004, an administrative law judge (ALJ) affirmed the cessation of benefits (Tr. 74). The Appeals Council vacated this decision and remanded the case for further consideration of Plaintiff's visual impairment and its vocational implications (Tr. 126-27). After a new hearing (Tr. 548), the ALJ again found Plaintiff not disabled as of February 1, 2001 (Tr. 43). The Appeals Council denied review (Tr. 8), thus making the ALJ's second decision, dated October 26, 2006 (Tr. 43), the Commissioner's final decision. This final decision is now ripe for review by this Court under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties have filed legal memoranda.   For the reasons set forth below, the Court finds that the Commissioner's decision is due to be **REVERSED AND BENEFITS AWARDED.**

---

[1] Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference dated March 24, 2009. [Doc. 16].

## I. Social Security Act Eligibility,
## the ALJ Decision, and Standard of Review

The Commissioner is required by statute to periodically review the continuing entitlement of disability recipients 42 U.S.C. § 423 (f); 20 C.F.R. § 404.1594; *Chumbly v. Shalala* 1994 WL 774030 (M.D. Ga.1994); *Allen v. Sullivan*, 1992 WL 443576 (N.D. Ala. 1992). Further, the Commissioner must follow an eight step evaluation process to determine whether a claimant's disability status has ceased and whether benefits, therefore, should be terminated 20 C.F.R. § 404.1594. The eight step evaluation process, set forth at § 404.1594 (f), is as follows:

1. Is the claimant engaged in substantial gainful activity? If yes, the claimant's disability status will cease.

2. If no, does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1 of Subpart P of Regulations No. 4.

3. If no, has there been medical improvement in the claimant's condition? If yes, proceed to Step 4. If no, the claimant's disability continues.

4. Is the medical improvement in the claimant's condition related to his ability to work? If no, proceed to Step 5. If yes, proceed to Step 6.

5. If the medical improvement in the claimant's condition is not related to his ability to work, do any of the exceptions listed apply? If no, the claimant's disability continues.

6. If the medical improvement is found to be related to the claimant's ability to work, the Secretary will determine whether all of the beneficiary's current impairments, in combination, are severe.

7. If these impairments are severe, the Secretary will assess the claimant's residual functional capacity to determine whether the claimant can perform his past relevant work. If the

>       Secretary determines that the claimant can perform his past
>       relevant work, his disability status will cease.
>
> 8.    If the claimant can no longer perform his past relevant work,
>       the Secretary will assess whether the claimant can do other
>       work.  If he can, his disability status will cease.

## II.  Review of Facts and Conclusions of Law

**A.    <u>Background Facts</u>**

The most recent favorable medical decision finding that Plaintiff was disabled is the determination dated November 13, 1996.  This is known as the "comparison point decision" or "CPD".  At the time of the "CPD", Plaintiff had the following medically determinable impairments: rheumatoid arthritis; blindness; and low vision.  These impairments were found to result in the residual functional capacity (RFC") to perform less than the full range of sedentary work.

Through February 1, 2001, the date Plaintiff's disability ended, Plaintiff did not engage in substantial gainful activity.  The medical evidence establishes that as of February 1, 2001, Plaintiff had the following medically determinable impairments: status post old left hip joint replacement, left eye blindness, right eye cataracts with visual acuity of 20/30 to 20/40, hyertension and cardiac abnormalities.

Plaintiff was born on April 25, 1955, and was 49 years old[2] at the time of his Administrative Hearing  (Tr. 36).  Plaintiff graduated from high school and went to a two-year agricultural college  and obtained a degree in dairy cattle science  (Tr. 583-583).  Plaintiff's past relevant work was as a driver of an 18-wheeler for 6 years and as a school bus driver for

---

[2] At all times material, the claimant has been a "younger' individual".  20 C.F.R. § 404.1563.

10 years (Tr. 587).

Plaintiff was suffering from degenerative arthritis of the left hip.  X-rays of the left hip showed severe degenerative arthritis of the hip joint with near total obliteration of the joint space and it appeared that bone was rubbing on bone.   Plaintiff's range of motion of the left hip was severely limited with tenderness and Plaintiff used a cane for ambulation.  A total hip replacement was recommended.

Plaintiff also had visual problems with a history of retinal detachments in the left eye and a mild cataract in the right eye.  Plaintiff's left eye was aphakic following scleral buckle surgery.  Plaintiff's best corrected vision in the right eye was 20/20, however it was 20/2000 in the left eye.  Plaintiff was unable to perform any task requiring good stereo vision of depth perception. Based on these findings Plaintiff was found to be disabled (Tr. 66).

On October 30, 1997, Plaintiff underwent left hip replacement surgery (Tr. 406). By June 23, 1998, treating physician, Dr. Robert Heineman reported, "He is doing well and does not have pain" (Tr. 394). On June 8, 2000, he had pain in his left hip and a back sprain that prevented "normal activity" for one and a half months.  Dr. Heineman reported, "[He] says that he had a nice winter and got up to being able to walk four miles every day in March and sometimes we would actually go six miles" (Tr. 383). On June 25, 2001, Dr. Heineman reported, "[T]he left hip has been functioning normally without any complaints but he had some right hip pain once during the winter and he wondered why that happened" (Tr. 380). Dr. Heineman also wrote that Plaintiff was "totally disabled as a truck driver" (Tr. 380). Additional notes reveal Plaintiff was markedly overweight; but stood and walked normally (Tr. 380).

On July 17, 2002, Plaintiff reported to Dr. Carol Fisher that "his hip is feeling well" (Tr. 448). Plaintiff walked without a limp and used no aides; x-rays revealed his hip replacement was in good position. Dr. Fisher found no evidence of wear or progressive radial lucencies or change in position. Plaintiff was to continue with low impact exercises and return in one year for follow-up x-rays of his hip (Tr. 448). Dr. Fisher completed a form (a date does not appear on the form) indicating Plaintiff experienced "inability to ambulate effectively," defined as "extreme limitation of the ability to walk". Further, that sitting in a low seat would affect his impairment and Plaintiff was limited in the lower extremities [20 lbs.] (Tr. 450-453) On July 13, 2005, Dr. Fisher reported, "He had a short episode of pain in his left hip but overall has been functioning very well" (Tr. 536).

On July 24, 2002, Dr. Patricia Hale reported that Plaintiff felt good, but had occasional right hip pain with prolonged walking. (Tr. 468). Dr. Hale's problem list for Plaintiff consisted of hypertension. Plaintiff's medications consisted of Cozaar 50 mg., and Allopurinol 300 mg. Plaintiff reported that he was sleeping and was feeling rested. (Tr. 469).

On March 10, 2004, Plaintiff underwent a Mayoview Spect Stress Test by Louis D. Rosenfield, M.D. of Cardiology Associates which indicated hypertension and abnormal EKG. RECOMMENDATION: "[I]n light of these findings, my recommendation is that this patient be considered for cardiac catheterization for definitive diagnosis." (Tr. 511).

On April 14, 2004, Dr. Valerie Crandall completed a Vision Evaluation Form. DIAGNOSIS: "Blind OS from retinal detachment, cataract OD, Ivitis (?) OD, Glaucoma OD". Dr. Crandall found reading, following written instructions, writing, driving, using computers and general work activities would be substantially reduced by Plaintiff's vision impairment(s).

-5-

Further, Plaintiff's vision impairments would substantially affect his "peripheral vision, central visual acuity, inability to distinguish detail, distant vision, near vision and visual efficiency". Dr. Crandall reported that all work activities would be affected by his vision impairments, to-wit: "handling, feeding, machine tending, alertness, inspecting, testing, eye-hand coordination or dexterity, laying out work, estimating quality, making precise measurements, making computations or mechanical adjustments to control or regulate work (Tr. 512-514)".  Plaintiff also reported to Dr. Crandall that he had headaches after reading and used a hand held lighted magnifier for reading (Tr. 493).  Plaintiff reported he did not drive at night due to his vision problems (Tr. 516).

On November 21, 2005, Scott L. Geller, M.D. , of the South Florida Eye Clinic examined Plaintiff and completed a Opthalmologic Evaluation Report under the Division of Disability Determinations.  Dr. Geller reported that Plaintiff was blind in the left eye and had 20/40 vision with correction in the right.  Dr. Geller's notes revealed that Plaintiff's impairment could be improved by extraction of Plaintiff's left eye. (Tr. 530).

On September 14, 2005, Dr. Dennis J. Picano completed a vision evaluation reviewing: visual acuity/intraocular pressures and found that when Plaintiff driving would experience "monocular vision = poor depth perception." The Plaintiff's peripheral vision was substantially affected, distant and near vision were slightly affected.  Further, Plaintiff's eye-hand coordination was affected.  Dr. Picano noted that he had examined all Plaintiff's medical records and that this condition has existed since 11/01/1997. (Tr. 543-546).

**B.      Specific Issues**

## I    THE ALJ FAILED TO GIVE WEIGHT TO ANY OF PLAINTIFF'S TREATING PHYSICIAN'S (SSR 96-2p).

Plaintiff contends the ALJ gave little weight to any of Plaintiff's treating physician's, to-wit: Drs. Louis Rosenfield, Valerie Crandall Moore, Carol S. Fisher, David W. Shoemaker and Dennis J. Picano[3]. However, statements and assessments of treating physicians are entitled to controlling weight (SSR 96-2p).

> "[T]he regulations and case law offer specific criteria for weighing medical source opinions. A disability opinion by a treating source should be given controlling weight if it is well-supported by clinical and laboratory findings and is consistent with other evidence. If the opinion is not given controlling weight, it should then be evaluated according to the length and nature of the treating relationship, the supportability of the opinion, consistency, specialization, and other factors that may be appropriate". 20 C.F.R. § 404.1527(d)(2) (2009).

The ALJ failed to recognize the long standing relationship Plaintiff maintained with Dr. Picano. The record indicates that Plaintiff was first treated by Dr. Picano on 5/24/90, which means that Dr. Picano's most recent assessment of Plaintiff was based on a sixteen year treatment history (T. 335 and 543). This treatment history should have been considered long enough for the treating physician to have obtained a complete picture of Plaintiff's impairments and thus his opinion should have been given controlling weight (20 CFR 404.1527 (d)(2)(i)).

Dr. Crandall Moore found that due to Plaintiff's vision impairments, many work activities would be substantially affected, up to and including: handling, feeling, off bearing (placing or removing materials from machines), machine tending, and alertness (T. 513). She

further stated that Plaintiff's vision impairments substantially affect his periperheral vision, central visual acuity, inability to distinguish detail, distant vision, near vision and visual efficiency (T. 512).

Dr. Fisher found Plaintiff had the inability to ambulate effectively. The ALJ rejected this finding. (T. 36). However, on Dr. Fisher's completed Listing 1.03 form, the description of the inability to ambulate effectively as found within the regulations, is printed at the bottom of the form and there is no indication on her statement that she failed to incorporate that definition within her findings (T. 535).

The Court finds that sufficient material and medical evidence is provided in the record and substantial evidence supports the opinions of Plaintiff's treating physicians that he continues to be disabled.

## II. THE ALJ ERRED IN FAILING TO APPLY SSR 02-1 REGARDING PLAINTIFF'S OBESITY

Plaintiff argues that the record documents a constant battle with obesity. Calculating his height (5' 8") and most recent weight (230 pounds), Plaintiff's body mass index ("BMI") is 35.0, which is Level II within the obesity guidelines found at SSR 02-1p (Tr. 551). Further, the ALJ notes Plaintiff's height and weight incorrectly in his decision and fails to consider the effects of the extra weight. (Tr. 34).

On 6/25/01, during his examination for pain in his left hip, Dr. Robert K. Heineman, Jr., describes Plaintiff as "markedly overweight" and unable to complete the range-of-motion examination due to Plaintiff's "protuberant abdomen" (Tr. 380). By 2004, Plaintiff's test results show an abnormal EKG and his weight was 227 pounds. (Tr. 499). At his hearing,

Plaintiff testified that his most recent weight was 230 pounds (T. 551). Records indicate that in 1996, when Plaintiff weighed less than his current weight, his doctors were concerned about the stress the additional weight was placing on his hip (Tr. 419). From 1996 to 2006, Plaintiff gained an additional eighteen pounds and Plaintiff contends this causes an increase in his hip pain and his cardiac concerns.

Plaintiff further argues the ALJ failed to consider the effects of obesity when he evaluated Plaintiff's complete disability, but the record shows the extra weight causes him pain. (Pl.'s Br. At 9.) The extra weight causes increased pain to Plaintiff's hips and limit the amount of weight he is able to lift and carry, his sitting, standing/walking ability and would require additional rest periods. It is clear that, considering his obesity, Plaintiff would be unable to perform at the "RFC" stated by the ALJ and would render him disabled and unable to be employed.

The ALJ's failure to consider the effects of Plaintiff's obesity when evaluating his total disability under SS 02-1 is an error of law and was necessary in order to have a complete assessment. The Court finds that substantial evidence and documentation supports Plaintiff's claim of obesity.

### III. ALJ'S HELD AN OFF-THE-RECORD DISCUSSION WITH COUNSEL

The record documents (letter to Plaintiff dated July 2, 2008) that the Appeals Council considered Plaintiff's counsel's contention that the ALJ did not provide Plaintiff with the opportunity for a full and fair hearing because he proposed to issue a decision finding that the Plaintiff was disabled as of April 14, 2004 ("[i]f Plaintiff would agree to amend his alleged

onset of disability to that date") and that this proposal was made "off the record".

The Appeals Council determined that the "off the record" discussion alluded to by counsel could not be corroborated or refuted by the evidence that was presented to the Appeals Council. (Pl.'s Memorandum of Law, Issue III, Pg. 9).

### IV.     PLAINTIFF CAN PERFORM THE CLEANER/ HOUSEKEEPER POSITION

The ALJ's statement that the job of cleaner/housekeeper did not require near acuity is contrary to Dr. Valerie Crandall Moore's findings (T.42). According to Dr. Crandall Moore, Plaintiff would be "substantially affected" in his capacity to do any work involving eye-hand coordination (T. 512). According to the Dictionary of Occupational Titles ("DOT") and its companion The Selected Characteristics of Occupations ("SCO"), the job of cleaner/housekeeper requires "frequent " handling and therefore, it is clear Plaintiff would lack the capacity to do this job.  Dr. Crandall Moore's findings were based on objective test results, e.g., bio-microscopy, visual field by confrontation, and fundoscopy (T. 532).  Dr. Crandall Moore also found Plaintiff's visual impairments met the listing 2.04 as his visual efficiency was compromised.

Additionally, as noted above Dr. Moore found that Plaintiff's vision impairments would substantially affect his ability to inspect, look for irregularities, lay out work, or make precise measurements.  The position of cleaner/housekeeper involves using cleaning supplies for cleaning, dusting, vacuuming, and making beds.  It is clear the Plaintiff would lack the capacity to do this job professionally as required.  Plaintiff must be able to read labels with great accuracy, make sure the dusting and vacuuming are satisfactory, etc.(Tr. 532).  Dr.

Moore also noted that her opinions were provided with a great degree of medical certainty, that she reviewed all of Plaintiff's medical records and that Plaintiff's condition has existed since November 1, 1977.  (Tr. 534).

Dennis J. Picano, M.D., also found Plaintiff's monocular vision resulted in poor depth perceptions and peripheral vision impairments, which "substantially affected" his ability to handle eye-hand coordination dexterity (T. 544).  Further, the "VE" testified that the vision limitations found by Dr. Picano, not only preclude Plaintiff's ability to perform the house-keeper position but also any other job (T. 578).

The Court finds that based on the material and medical evidence provided in the record and the opinions of Plaintiff's treating physicians substantial evidence has been provided to confirm that Plaintiff continues to be disabled.

### V. PLAINTIFF CAN PERFORM OTHER JOBS IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff contends that the job requirements found within the Dictionary of Occupation Titles are inconsistent with the ALJ'S "residual functional capacity" of light level of exertion with the caveats of: "[N]o driving after dark, no driving significant distances, no frequent reading of small print; occasional climbing, balancing, stooping, kneeling, crouching and crawling; no climbing ladders, ropes, scaffolds or at open heights; and must avoid concentrated exposure to extreme temperatures".  (Tr. 37).

Based on the "VE's" testimony, the ALJ found that Plaintiff could perform the following jobs: cleaner/housekeeper; store greeter; and furniture rental consultant. (Tr. 42). However, according to data from the Dictionary of Occupational Titles ("DOT") these

-11-

positions conflict with the ALJ's "RFC" . Where there is such a conflict, SSR 00-4p, requires the ALJ to resolve the conflict.

The VE testified that "near acuity" is frequently required in the job of rental consultants, is not required in the housekeeper position and that the store greeter is not contained in the DOT (Tr. 572 - 577). The position of furniture rental consultant requires frequent near acuity for activities such as completing rental contracts, reading, writing, assembling, etc. Therefore, the hypothetical question posed by the ALJ eliminates this job from consideration. The job of cleaner/housekeeping would involve substantial standing and walking, occasional climbing of ladders and visual inspections for cleanliness  The record shows that all these activities exceed Plaintiff's functional capacities. *Gravel v. Barnhart*, 360 F. Supp. 2d 442, 2005 U.S. Dist. LEXIS 3855).

The Court find that in this case, the ALJ failed under SSR 00-4p to compare the "DOT" requirements with the VE testimony and determine whether a conflict existed. The ALJ failed to elicit a reasonable explanation from the VE for the inconsistencies noted above.

Therefore, the Court finds that substantial medical evidence supports that Plaintiff is unable to perform the jobs as presented by "VE" and continues to be disabled.

### VI. CONCLUSION

The Court finds that the ALJ failed in to articulate the effect of all of Plaintiff's combined impairments in determining his disability. *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987). The ALJ also failed to provide substantial evidence to this Court that Plaintiff has the residual functional capacity to perform the exertional and non exertional requirements of any work which exists in the national economy due to Plaintiff's: "obesity, the

severity of Plaintiff's pain and visual limitations and in determining if there is other work Plaintiff can perform.

Substantial evidence supports the conclusion the Plaintiff is disabled and unable to perform work as it exists in the national economy.

For the reasons stated above, the Clerk shall enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) **reversing** the decision of the Commissioner and **awarding** Plaintiff benefits and close the file.

**DONE and ENTERED** at Fort Myers, Florida this 7th day of December, 2010.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
Carol Avard, Esquire
Susan Roark Waldron, A.U.S.A., Defendant/Commissioner